

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 2-08-183-CV

IN THE INTEREST OF J.F., J.J.,
AND J.J., CHILDREN

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. Introduction

Appellant Brandy F. appeals the trial court's judgment terminating her parental rights to her three children—John, Julie, and Jennifer (collectively "children").[2]  In four issues, Brandy argues that the evidence is legally and factually insufficient to support the trial court's findings.  We affirm.

---

[1] *See* Tex. R. App. P. 47.4.

[2] We use aliases for the names of the children:  J.F. will be referred to as John, the older J.J. as Julie, and the younger J.J. as Jennifer.  *See* Tex. R. App. P. 9.8(b)(2).

## II. Procedural History

In October 2005, the Texas Department of Protective and Regulatory Services ("the Department") filed a petition to terminate Brandy's parental rights to John, Julie, and Jennifer. After a bench trial, the trial court found that the Department had failed to comply with section 262.114 of the Texas Family Code and denied the Department's petition. On appeal, we held that the trial court's "death penalty" sanction as to the termination of Brandy's parental rights was excessive under the circumstances, and we reversed and remanded the cause for further proceedings. *In re J.F.*, No. 02-07-00007-CV, 2007 WL 2963690, at *8 (Tex. App.—Fort Worth Oct. 11, 2007, pet. denied) (mem. op.). On remand, the trial court, basing its decision on the already existing trial record, signed an order terminating Brandy's parental rights to her children.[3] This appeal followed.

---

[3] We have been advised that the audiotape recording of the proceedings held below after remand is blank; therefore, there is no additional reporter's record. No party complains of this omission. Further, the order of termination and the parties provide that the trial court considered the original trial record in making its decision, and the parties refer to the original reporter's record in their briefing. Therefore, in the interest of justice, we take judicial notice of the reporter's record in the prior appeal of this cause and likewise refer to it in our opinion.

2

## III.  Evidentiary Sufficiency

In her first two issues, Brandy argues that the evidence is factually insufficient to support the trial court's endangerment findings.  *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E) (Vernon 2008).  In her third and fourth issues, Brandy argues that the evidence is legally and factually insufficient to support the trial court's best interest finding.  *See id.* § 161.001(2).

### A.  Standard of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right."  *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003).  "While parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right."  *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).  In a termination case, the State seeks not just to limit parental rights but to erase them permanently — to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit.  Tex. Fam. Code Ann. § 161.206(b) (Vernon 2008); *Holick v. Smith*, 685 S.W.2d 18,

3

20 (Tex. 1985).  We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent.  *Holick*, 685 S.W.2d at 20–21; *In re M.C.T.*, 250 S.W.3d 161, 167 (Tex. App.—Fort Worth 2008, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child.  Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.  *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear and convincing evidence.  Tex. Fam. Code Ann. §§ 161.001, 161.206(a).  Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  *Id*. § 101.007 (Vernon 2002).  Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child.  *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243

4

S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id*. This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id*. We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Id*. We must consider, however, undisputed evidence even if it is contrary to the finding. *Id*. That is, we must consider evidence favorable to termination if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id*.

We must therefore consider all of the evidence, not just that which favors the verdict. *Id*. But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id*. at 573, 574. And even when credibility issues appear in the appellate record, we must defer to the factfinder's determinations as long as they are not unreasonable. *Id*. at 573.

5

In reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated the endangerment grounds of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

**B. Evidence Presented at Trial**

In October 2005, the Department removed Brandy's children from her care and placed them into foster care after having received numerous referrals alleging neglect, physical abuse, and sexual abuse of the children.

**1. Sexual Abuse**

The evidence indicated that Brandy's father, "Grandfather Danny," had sexually abused both Julie and Jennifer. During a therapy session with Laura Greuner, a therapist who specializes in working with children who have been sexually abused and who suffer from post-traumatic stress disorders, Julie

6

confided that she had been sexually abused by Grandfather Danny. She told Gruener that her grandfather had touched her private area four times, and then she talked about how he would pull her pants down and touch her. Jennifer, in a separate counseling session, told Gruener that Grandfather Danny would have both her and her sister "get naked" and then he would look at them and touch them. Gruener testified, "[Jennifer] said to me that [Grandfather] Danny touched us here and she touched herself on her private area over her clothes to show me what she was talking about."

Julie confided to Virginia Caldwell, a registered nurse at Cook Children's Hospital, that her Grandfather Danny had put a "pink stick" in her genital area and in her "butt." She further stated that her clothes were off when this happened and that it hurt. Dr. Parnell Ryan, who conducted a psychological evaluation of Julie, described Julie as a little girl struggling with sadness. Dr. Ryan testified that Julie had advised him that her grandfather had fondled her vagina.

During trial, Brandy testified that her father, Grandfather Danny, started making sexual advances towards her when she was thirteen years old. She admitted this to nurse Caldwell while the nurse gathered a social history during Julie's examination. Brandy also testified that she had believed Julie when Julie made her initial outcry against Grandfather Danny in March 2004.

However, despite her own childhood history with Grandfather Danny and her knowledge that he had sexually abused Julie in March 2004, Brandy sent the children to live with him in September 2004.

**2. The Safety Plan**

A Department worker, Christiana Smith, began working with the family in December 2004. Brandy and the Department agreed upon a safety plan that included a prohibition of any contact between the children and Grandfather Danny. Brandy also agreed to individual therapy for herself, individual therapy for the children, parenting classes, random drug tests to insure that she was drug free, and participation in a drug assessment if any drug tests were positive.

Brandy violated the safety plan by testing positive for marijuana and pain killer medication in April 2005, and the Department removed the children from her care and placed them with Brandy's mother, Robin F. Robin had instructions to supervise all contact between the children and Brandy.

Smith continued to provide services to Brandy, including bus passes for transportation and even personally driving Brandy to some of the services. However, Brandy was eventually dropped from her drug abuse classes for noncompliance, the children were not taken to counseling (even though the Department paid for this service and agreed to assist in transportation), and a

8

Department worker caught Brandy having unsupervised contact with the children—all violations of the safety plan.

In addition, Brandy allowed Grandfather Danny to be in the car with the children as they traveled to a counseling session with Gruener. This concerned Gruener because it was a safety plan violation and because the children were being taken to therapy sessions where they were likely to talk about the sexual abuse perpetrated on them by the same man who would be driving them home following the therapy session. Finally, the Department discovered that Brandy had permitted Grandfather Danny to have contact with the children on another occasion at a Chuck E. Cheese restaurant. Brandy testified to this "Chuck E. Cheese safety plan violation" and admitted that she was actually present when it occurred.

### 3. Domestic Violence

Once in foster care, the children told of other instances of exposure to abuse and neglect, including regularly witnessing domestic violence between Brandy and their father. Brandy admitted at trial that she and the children's father had exposed the children to violent confrontations. She testified about one instance in which she and the children's father had fought and hit each other while sitting in the car with John and Julie. Brandy described the "assault in the vehicle" to Randee Kaitcer, the children's court appointed special

9

advocate ("CASA"), telling Kaitcer that the children's father had punched her in the mouth and made her bleed. Kaitcer confirmed that Julie had witnessed this bloody assault. Brandy testified to further instances in which she and the children's father would yell and scream, and he would grab her and push her up against something to shut her up. Brandy admitted that John was affected by the violence, and that he would yell at his father to stop hitting his mother.

As a result of witnessing this violence, John confided to Gruener and Dr. Ryan that he was angry and that when he attempted to intervene and protect his mother, he would "get hit." Julie, also affected by the violence, told Gruener that she had seen her father hit her mother, that it made her mother bleed, and that she was "scared about that." She had also confided to Dr. Ryan that she had witnessed her father hitting her mother.

In addition to witnessing domestic violence, Brandy also exposed the children to sexual acts between her and the children's father. Brandy's explanation to allowing the children to watch such acts was that, since all of the family lived in one room, she and the children's father proceeded to do what "adults do." John told Dr. Ryan that he had watched his parents having sex and that he had attempted to perform such acts on his sister. Julie confirmed this by telling Dr. Ryan that her brother John would lay on top of her,

slobber on her neck, and rub himself against her. Julie referred to this behavior as "sex" and said that she had watched her mother and father have sex.

### 4. Suicide Attempt

In May 2005, Brandy attempted to commit suicide by overdosing on sleeping pills. She testified that she did not want to "deal with anything at the time" and that she thought suicide "would be a quick way out." Brandy received treatment for her depression and was prescribed two types of medications; however, she quit taking the medications because she did not like the way they made her feel.[4]

### 5. Overall Compliance

By the time this case went to trial, Brandy had failed to complete her drug classes (having been discharged three times for noncompliance), had not taken GED classes, had not attended nonoffender sexual abuse classes, had not attended her therapy sessions for domestic violence, and was virtually noncompliant with her individual therapy.

## C. Endangerment under Subsections (D) and (E)

In her first and second points, Brandy argues that the evidence is factually insufficient to establish that she endangered her children. Endangerment is

---

[4] At the time of trial, Brandy had begun taking her medications again.

defined as exposing to loss or injury, to jeopardize. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. *In re D.T.*, 34 S.W.3d 625, 632 (Tex. App.—Fort Worth 2000, pet. denied). To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child, nor is the child required to suffer injury. *Boyd*, 727 S.W.2d at 533. Rather, a child is endangered when the environment or the parent's course of conduct creates a potential for danger that the parent is aware of but disregards. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the "conditions or surroundings" of the child's home under section 161.001(1)(D). *In re J.L.W.*, No. 02-08-00179-CV, 2008 WL 4937970, at *6 (Tex. App.—Fort Worth Nov. 20, 2008, no pet.) (mem. op.); *see also In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ) (stating that "environment" refers not only to the acceptability of living conditions, but also to the parent's conduct in the home). A parent need not

12

know for certain that the child is in an endangering environment; awareness of such a potential is sufficient. *See S.M.L.*, 171 S.W.3d at 477.

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. *J.T.G.*, 121 S.W.3d at 125. Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *Id.*; *D.T.*, 34 S.W.3d at 634.

A parent's mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct that jeopardizes the child's physical or emotional well-being. *See also In re C.D.*, 664 S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no writ); *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.). This includes a parent's attempts to commit suicide. *See In re A.M.C.*, 2 S.W.3d 707, 716 (Tex. App.—Waco 1999, no pet.) (holding that mother endangered children by her suicidal thoughts, suicide attempts, and neglect).

Because the evidence pertaining to subsections 161.001(1)(D) and (E) is interrelated, we may conduct a consolidated review. *In re M.C.T.*, 250 S.W.3d 161, 169 (Tex. App.—Fort Worth 2008, no pet.); *see also In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.) (holding that there

13

was legally and factually sufficient evidence of both endangerment grounds when, among other things, the evidence showed that the mother exposed her children to domestic violence and refused to participate in her CPS service plan).

The record demonstrates that Brandy was aware that her father, Grandfather Danny, had sexually assaulted at least one of her children. Notwithstanding this knowledge, Brandy sent the children to live with Grandfather Danny and then continued to allow him access to the children even after a safety plan had been implemented prohibiting contact between him and the children. The record also demonstrates that there were domestic violence issues between Brandy and the children's father, which the children witnessed on a regular basis. Brandy herself testified that the violent fights between herself and the children's father affected John—there was even evidence that this included physical abuse. The record also revealed that the children were beginning to exhibit disturbing behavior as a result of their parents' having sex in the children's presence. Finally, Brandy admitted that she had attempted to commit suicide and had stopped taking her prescribed depression medications.

Having carefully reviewed the entire record, giving due deference to the factfinder, we conclude that the trial court could have reasonably formed a firm belief or conviction that Brandy knowingly placed John, Julie, and Jennifer in

14

conditions, or engaged in conduct, that endangered the children's physical or emotional well-being and also knowingly placed the children with a person whose conduct endangered the children's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *M.R.*, 243 S.W.3d at 819. Therefore, we hold that the evidence is factually sufficient to support the trial court's endangerment findings. Accordingly, we overrule Brandy's first and second issues.

## D. Best Interest Finding

In her third and fourth issues, Brandy argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the children's best interest.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (Vernon 2002). The following nonexclusive factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

> (1) the child's age and physical and mental vulnerabilities;
>
> (2) the magnitude, frequency, and circumstances of the harm to the child;

15

(3) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(4) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(5) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(6) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(7) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(8) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

> (A) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

> (B) guidance and supervision consistent with the child's safety;

> (C) a safe physical home environment; and

> (D) protection from repeated exposure to violence even though the violence may not be directed at the child.

*Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

16

(1) the desires of the child;

(2) the emotional and physical needs of the child now and in the future;

(3) the emotional and physical danger to the child now and in the future;

(4) the parental abilities of the individuals seeking custody;

(5) the programs available to assist these individuals to promote the best interest of the child;

(6) the plans for the child by these individuals or by the agency seeking custody;

(7) the stability of the home or the proposed placement;

(8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(9) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id*. On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id*.

Regarding the first factor, the children were too young to testify at trial; however, Dr. Ildiko Balla, one of the children's therapist, presented evidence that the children love their mother and have a close bond with her. Nevertheless, Gruener and Dr. Ryan also presented evidence that while in Brandy's care, the children were exposed to sexual abuse, domestic violence, and neglect.

Regarding the second factor—the children's present and future physical and emotional needs—the record revealed that Brandy neglected the children on more than one occasion, even going so far as failing to take the children to their required counseling sessions.

The endangerment discussion above addressed the third, fourth, and eighth factors—the present and future physical and emotional dangers to the children, as well as Brandy's parenting abilities, or lack thereof, and her acts and omissions. *See In re D.S.*, 176 S.W.3d 873, 879 (Tex. App.—Fort Worth 2005, no pet.) (holding that evidence of a parent's unstable lifestyle, including drug use and inability to provide a stable home, can support a factfinder's conclusion that termination is in the child's best interest), *superseded by statute on other grounds as recognized in In re D.A.R.*, 201 S.W.3d 229, 230–31 (Tex. App.—Fort Worth 2006, no pet.).

18

Concerning the fifth factor—the programs available to assist these individuals to promote the best interest of the child— Brandy failed to complete her drug classes (having been discharged three times for noncompliance), did not attend nonoffender sexual abuse classes, did not attend her therapy sessions for domestic violence, and was virtually noncompliant with her individual therapy.

Regarding the sixth factor, Brandy did not list her plans for the children. Mary Jokisch, the Departmental worker assigned to Brandy after the Department removed the children, testified that termination of Brandy's parental rights would be in the children's best interests due to their therapeutic needs, which Brandy was not meeting. Jokisch further testified that the Department had families available to adopt the children.

The seventh factor—the stability of the proposed placement—Jokisch testified that termination followed by adoption would give the children the stability and structured environment that they needed.

Finally, concerning the ninth factor—any excuse for the parent's acts or omissions—Brandy testified that she did not complete her services because she simply gave up. She further testified that it did not dawn on her, until after the fact, that moving the children in with Grandfather Danny would be emotionally damaging for them.

19

Giving due consideration to the evidence that the factfinder could have reasonably found to be clear and convincing, we hold that a reasonable trier of fact could have formed a firm belief or conviction that the termination of Brandy's parental rights would be in the children's best interest. *See In re J.L.W.,* No. 02-08-00179-CV, 2008 WL 4937970, at *9–10 (Tex. App.—Fort Worth Nov. 20, 2008, no pet.) (mem. op.) (holding that evidence was legally and factually sufficient to support trial court's best interest finding when evidence revealed that returning child to mother would risk child's emotional and physical well-being because of couple's past history of domestic abuse and because of mother's inability to care for any of her four children). Therefore, we hold that the evidence was legally sufficient to support the trial court's best interest finding. We also hold, based on the entire record, that the evidence was factually sufficient to support the trial court's best interest finding. Accordingly, we overrule Brandy's third and fourth issues.

## IV. Conclusion

Having overruled all of Brandy's issues, we affirm the trial court's judgment terminating Brandy's parental rights to her three children.

BOB MCCOY
JUSTICE

PANEL: LIVINGSTON, DAUPHINOT, and MCCOY, JJ.

DELIVERED: March 26, 2009

20